FILED
MINNEAPOLIS, MINN

2018 SEP 18 PM 12:48

CITY CLERK
DEPARTMENT

**STATE OF MINNESOTA**
**FOURTH JUDICIAL DISTRICT**
**HENNEPIN COUNTY**

---

Loren Underwood,
Individually and on behalf of all others similarly situated

Plaintiff,
v.

City of Minneapolis and Minneapolis Police Officers "John Does 1 through 8."

Defendants.

Civil Action No. _____

**CLASS ACTION COMPLAINT**

**JURY DEMANDED**

## INTRODUCTION

Loren Underwood, the Plaintiff and putative class representative, brings this Complaint based on the following facts:

## JURISDICTION

1. This action is based on, and seeks redress for, violations of the United States Constitution, Minnesota's statutory civil theft statute, Minnesota common law claims and therefore jurisdiction is proper pursuant to 42 U.S.C. §1983; Minn. Stat. § 484.01, Subd. (1).

## VENUE

2. Venue is proper in the Fourth Judicial District pursuant to Minn. Stat. § 542.09.

## PARTIES

3. Loren Underwood, the Plaintiff, is an adult male who resides, and at all relevant times has resided, in the state of Minnesota.

4

4. The City of Minneapolis is a municipal corporation located in Hennepin County and subject to suit by virtue of Minn. Stat. § 412.211 and 42 U.S.C. §1983.

5. Officers John Does 1 through 8 are licensed peace officers employed by the City of Minneapolis who participated in the seizure of the Plaintiff, the search of his home, and the seizure of his property. The true names are not known at this time but can be readily identified through discovery.

## FACTUAL ALLEGATIONS

6. On or about July 13, 2018, Plaintiff learned from his neighbors that Minneapolis police officers visited his home and a local bar looking for him.

7. Plaintiff was not home or at the bar the first time when the police officers arrived.

8. Plaintiff suspected, based on his family history and communications with a member of his family, that one of his family members had reported, falsely, that Plaintiff was suicidal.

9. Plaintiff was not suicidal.

10. At approximately 10 PM, Plaintiff returned home and called 911 and spoke to a dispatcher and advised the 911 operator that "there was no emergency" at his home.

11. He offered to come to the police station to explain (with documentation) that the allegations of his suicidal ideations were false.

12. Ultimately, he arranged to have the police officers meet him at his home.

13. He provided the 911 dispatcher his full name, date of birth, and address.

5

14. During the course of his call to 911, Plaintiff gave no indication that he was thinking irrationally or that he posed a threat to the police officers.

15. When the police arrived—approximately eight of them, guns drawn—Plaintiff was already outside of his home.

16. He had emptied his pockets prior to the arrival of the police and had no weapons of any sort on his person.

17. Plaintiff did, however, have his computer tablet (which he intended to use to show the police officers that the claim of his suicidal intentions were false), his wallet and his cellphones resting on the tailgate of his truck.

18. When the police arrived with guns drawn, Plaintiff immediately put his hands in the air.

19. The police officers immediately frisked the Plaintiff, placed him in handcuffs, and then placed him in the back of a police vehicle, all without incident.

20. Plaintiff continuously told the officers that the allegations were false and that he could demonstrate as much by accessing emails on his tablet.

21. The police officers ignored his request to clear up the misunderstanding.

22. Approximately twenty minutes later, an officer opened the police vehicle where Plaintiff was seated and asked him "what's this all about?"

23. Plaintiff attempted to explain, but that officer would not consider the information Plaintiff attempted to provide.

24. A second police officer approached the vehicle, approximately ten minutes after the first police officer, and asked Plaintiff "who is inside?"

6

25. The Plaintiff responded "no one."

26. The officers then took Plaintiff's keys and entered his home.

27. The officers did not have Plaintiff's consent to enter his home.

28. The officers did not have a warrant to enter his home.

29. The officers did not have probable cause that a crime had been committed in the Plaintiff home.

30. The officers did not have probable cause to believe that evidence of a crime was present in Plaintiff's home.

31. Further, there were no exigent circumstances that required the officers to enter the Plaintiff's home.

32. As Plaintiff indicated, the police found no one else in his home.

33. They did, however, find multiple firearms, ammunitions, and bows.

34. Plaintiff has no criminal history that prevents him from possessing firearms, ammunition, or bows.

35. Plaintiff has no mental incapacity that prevents him from possessing firearms.

36. Plaintiff has never been the subject of any civil commitment proceedings.

37. There is no legal impediment to Plaintiff's possession of firearms, ammunition, and/or bows.

38. Plaintiff has no criminal convictions that make him ineligible to possess firearms.

39. After searching Plaintiff's home, the police officers then began to search Plaintiff's truck.

40. Plaintiff did not give his consent for the search of his truck.

41. The police officers had no warrant to search the Plaintiff's truck.

42. There were no exigent circumstances that compelled the immediate search of the Plaintiff's truck.

43. The police officers had no probable cause to believe that the contents of the truck included contraband.

44. The search of Plaintiff's home and car went on for approximately one hour.

45. Plaintiff could see the police officers load some of his firearms into the police vehicles.

46. When the police were done raiding his home and his vehicle they sent him to Hennepin County Medical Center for a psychological evaluation.

47. He was released from the hospital the following morning after explaining to the doctor (with the help of his step-dad and documentation) the very thing he attempted to explain to the police—claims of him having suicidal ideations were false.

48. The evaluating doctor found no basis to believe that Plaintiff suffered any mental condition that made him a danger to himself.

49. The evaluating doctor found no basis to believe that Plaintiff suffered any mental condition that made him a danger to others.

50. When Plaintiff returned home from the hospital he inventoried his home and learned that the police had taken his property; specifically he logged that the police had taken, among other things, his firearms, ammunition, and bows.

51. Once released from the hospital, Plaintiff called 911 to make a

police report against the person who falsely reported him suicidal.

52. When the police arrived to take the report, Plaintiff explained why the initial report of his suicidal intentions was false and asked to get his firearms back.

53. The Officers refused to take a police report for false statements to the police (Minn. Stat. §609.505).

54. Instead, the police officers advised the Plaintiff that they had no choice but to take him to the hospital when a report of suicidal ideations are made.

55. They further advised him of resources that would help him deal with the mental health issues of his family.

56. Plaintiff inquired of the officers of how to get his property back, and they told him to go to City Hall and visit the property department with a picture identification card.

57. Plaintiff went to the Minneapolis City Hall the following Monday and an employee of the City told Plaintiff that "there's a process that you have to follow to get the property back."

58. The employee handed him a copy of the Defendant's policy number MP-9077 (8.13) (Attached as Exhibit A to this Complaint).

59. Plaintiff was then directed to Lieutenant Mike Taylor of the Second precinct.

60. Plaintiff left Lt. Taylor three voice mail messages requested a call back.

61. A week later Lt. Taylor called Plaintiff back.

62. Plaintiff advised Lt. Taylor that he had serious concerns for his safety and that he needed his firearms returned.

9

63. Lt. Taylor told the Plaintiff that City has a policy that requires a ninety (90) day waiting period before *any* firearm can be returned.

64. Plaintiff told Lt. Taylor that the firearms were taken illegally and that he wanted them returned sooner than ninety (90) days.

65. Lt. Taylor advised the Plaintiff that he would lose his job if he deviated from the waiting period.

66. Lt. Taylor further advised the Plaintiff that he had been in charge of enforcing the firearms policy for four years and that he has never deviated from that policy and was not going to deviate from that policy in the Plaintiff's case.

67. Lt. Taylor told the Plaintiff that he would receive a questionnaire in the mail in the next couple of weeks that would start the process.

68. To date, Plaintiff has not received that questionnaire.

69. Lt. Taylor also told the Plaintiff that he would have to undergo an extensive "background check unlike any that you've done in the past," before the City would release his property.

70. To date, the City is still in possession of all of the property it took from the Plaintiff's home.

71. Defendants' conduct, as detailed above, caused Plaintiff and similarly situated individuals to suffer harm and damages.

### CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF THE FOURTH AMENDMENT
### AGAINST OFFICERS JOHN DOE 1 THROUGH 8
### (SEARCH OF THE PLAINTIFF'S HOME AND TRUCK)

72. Plaintiff re-alleges the previous allegations and incorporates those allegations herein by reference.

10

73. Defendant Does 1-8 entered and searched Plaintiff's home without a warrant, his consent, or any exigent circumstances.

74. Defendant Does 1-8 searched Plaintiff's home for firearms and ammunition without a warrant, his consent, or any exigent circumstances.

75. A warrantless search of a home is *per se* unreasonable and violates the Fourth Amendment to the Constitution of the United States.

76. As an actual and proximate result of Defendant's conduct, the Plaintiffs have been injured and suffered damages, which amount shall be determined at trial.

### COUNT II
### VIOLATION OF THE FOURTH AMENDMENT
### AGAINST OFFICERS JOHN DOE 1 THROUGH 8
### (INITIAL SEIZURE OF THE PLAINTIFF'S PROPERTY)

77. Plaintiff re-alleges the previous allegations and incorporates those allegations herein by reference.

78. The search of Plaintiff's home produced several firearms, bows, ammunition and other property belonging to the Plaintiff ("Plaintiff's property").

79. Plaintiff's Property remains in the custody of the City of Minneapolis.

80. Plaintiff's Property is not inherently contraband.

81. Plaintiff's Property is not evidence of any crime.

82. Plaintiff has requested the return of his property and the City of Minneapolis has refused his request.

83. The initial seizure of Plaintiff's Property constitutes a violation of the Fourth Amendment's prohibition against unreasonable

seizures.

84. As a result, Plaintiff has been harmed and seeks damages that will be determined by a jury.

## COUNT III
## VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENT AGAINST CITY OF MINNEAPOLIS
## (CONTINUED DEPRIVATION OF PROPERTY PURSUANT TO OFFICIAL CITY POLICY)

85. Plaintiff re-alleges the previous allegations and incorporates those allegations herein by reference.

86. The Due Process Clause of the Fifth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment to the United States Constitution, makes plain that "nor shall any person be deprived of life, liberty, or property, without due process of law."

87. The City of Minneapolis has imposed a policy (Exhibit A) that at minimum ninety-days must lapse before it will return any firearms or ammunition to its owner.

88. The policy applies without regard as to how the City of Minneapolis came to possess the firearms or ammunition.

89. The policy applies without regard as to the City of Minneapolis's need to retain the firearms or ammunition as evidence in any criminal or civil matter.

90. The policy does not provide an opportunity to challenge the City of Minneapolis retention of firearms or ammunition once they are seized.

91. The policy does not provide for a neutral arbiter to adjudicate that the City of Minneapolis has any lawful claim to possess the seized firearms or ammunition.

92. As an actual and proximate result of City of Minneapolis's

Removal Exhibit 2 - Complaint

policy, Plaintiff and others have been injured and suffered damages, which amount shall be determined at trial.

## COUNT IV
## CIVIL THEFT (MINN. STAT. §604.14)
## AGAINST CITY OF MINNEAPOLIS

93. Plaintiff re-alleges the previous allegations and incorporates those allegations herein by reference.

94. The items seized in the search of the Plaintiffs home and vehicle belonged to the Plaintiff.

95. The Plaintiff did not authorize any of the Defendants to take or keep his property.

96. None of the Defendants had any lawful basis to take or keep his property.

97. The prolonged taking of Plaintiff's property amounted to civil theft in that:

   a. The property belonged to the Plaintiff.
   b. The Plaintiff did not give the City of Minneapolis consent to take his property.
   c. The City of Minneapolis was without legal justification for taking Plaintiff's property.
   d. The extended seizure of Plaintiff's property manifest the City's intent to keep Plaintiff's property.

98. As an actual and proximate result of the City of Minneapolis's conduct, Plaintiff has been injured and suffered damages, including statutory damages, which amount shall be determined at trial.

13

## COUNT V
## CONVERSION (MINNESOTA COMMON LAW)
## AGAINST ALL DEFENDANTS

99. Plaintiff re-alleges the previous allegations and incorporates those allegations herein by reference.

100. Common law conversion in Minnesota is an act of willful interference with a chattel, done without lawful justification, by which any person entitled thereto is deprived of use and possession.

101. Plaintiff was the owner of the property taken from his home.

102. The Defendants had no legal justification for interfering with his possession or use of that property.

103. All Defendants committed conversion by taking and or retaining his property without legal justification.

104. As an actual and proximate result of Defendant's conduct, Plaintiff has been injured and suffered damages, which amount shall be determined at trial.

## COUNT VI
## TRESPASS TO CHATEL (MINNESOTA COMMON LAW)
## AGAINST ALL DEFENDANTS

105. Plaintiff re-alleges the previous allegations and incorporates those allegations herein by reference.

106. Trespass to chattel occurs when one intentionally interferes with another's rights of exclusive possession.

107. All of the Defendants committed trespass on the Plaintiff's chattel when they took or kept the Plaintiff's property.

108. As an actual and proximate result of Defendant's conduct, Plaintiff has been injured and suffered damages, which amount shall be determined at trial.

14

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for relief against the Defendants as follows:

109. For an Order, upon motion by the Plaintiff, to certify a class of plaintiffs.

110. For redress of all loss, harm, and injuries that resulted from the Defendants' unconstitutional or otherwise unlawful acts.

111. For an injunctive relief prohibiting enforcement of the City of Minneapolis Policy requiring a waiting period before it will return firearms to its perspective owners.

112. For interest, where appropriate, on damages awarded.

113. For costs, disbursements, and attorneys' fees incurred in the prosecution of this action pursuant to, without limitations, 28 U.S.C. §1988 and Minn. Stat. §§363A.29 and 363A.33, Subd. 7.

114. For statutory damages as authorized under Minnesota law.

115. For leave to amend this Complaint to supplement any factual deficiencies or otherwise address any pleading deficiencies herein.

116. For nominal damages as authorized under Minnesota and federal law.

117. Award such other relief as the Court deems just and equitable.

Dated: September 18, 2018

Respectfully submitted

A. L. Brown (# 331909)
Joshua R. Williams, *Of Counsel*
**Capitol City Law Group, LLC**
**The Allen Building**
287 East Sixth Street, Suite 20
Saint Paul, Minnesota 55101
Telephone (651) 705-8580
Facsimile (651) 705-8581
E-Mail: A.L.Brown@cclawg.com

**ATTORNEYS FOR PLAINTIFF**